**LEAH W. GONZALES**
California State Bar No. 311969
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Leah_Gonzales@fd.org

Attorneys for Defendant
CHRISTOPHER WEST

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE GONZALO P. CURIEL)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER WEST,<br><br>Defendant. | CASE NO.:   20-cr-00317-GPC<br><br>Hon. Gonzalo P. Curiel<br>Date: June 25, 2021<br>Time: 8:30 a.m.<br><br>**MR. WEST'S SENTENCING MEMORANDUM** |

## I.   INTRODUCTION

*"It was stupid, it was the devil taking over, I hate myself for doing it."* – Christopher West

It has been about a year and a half since Mr. West's arrest – his first and only arrest. During that time, he has made significant positive changes in his life. He stopped hanging out with the negative influences, he found stable, full-time employment after years of only having seasonal work, and, critically, he has worked and maintained sobriety. Mr. West also began mental health counseling to treat his long term anxiety and depression. He is getting his life on the right path. While his health has been recently problematic and worrisome – he has heart surgery scheduled three days after his sentencing hearing – Mr. West has demonstrated that he can move past his offense and overcome adversity created by his poor decision.

Mr. West is on a good path now. He asks the Court to consider a sentence of 18 months home confinement followed by supervised release so that he can continue on that path and prove to the Court that he is, indeed, a changed man.

## II. STATEMENT OF FACTS

### A. Christopher West: The Individual Before the Court

Mr. West is a thirty-eight year old, lifelong resident of the San Diego area. Although he was financially supported during his childhood, his father, a retired United States Navy Officer, physically abused both Mr. West and his mother. The abuse was frequent, and only ceased when Mr. West was able to defense himself.[1]

Despite the abuse, Mr. West graduated from high school in 2001. Although he did not attend formal post-secondary education, Mr. West taught himself how to use several computer programs. While Mr. West was unemployed for a short time leading up to the time of his offense, Mr. West regularly had consistent employment as an adult. The work included construction, kitchen staffing, and store clerking – almost all seasonal, minimum wage jobs.[2]

Mr. West is twice divorced. He has one son with his ex-wife, Cristy. By all accounts, the divorce was amicable, and the couple continue to co-parent and raise their preteen son together. Unfortunately, Mr. West's son has primary immunodeficiency disorder ("PID") that was diagnosed when he was young.[3] His

---

[1] *See* PSR at ¶¶ 28, 30.

[2] *See id.* at ¶¶ 44, 46.

[3] *Primary immunodeficiency*, Mayo Clinic, available at: https://www.mayoclinic.org/diseases-conditions/primary-immunodeficiency/symptoms-causes/syc-20376905 (last accessed June 18, 2021) (Describing the disease as one that weakens the immune system's defense or causes the immune system to not work properly, including making someone more susceptible to germs that can cause infections. While some variants of PID are mild and can go undetected for years, other types of PID are <u>*so severe that they are discovered as soon as someone is born.*</u>) (emphasis added).

son's PID requires frequent hospitalizations and intensified medical treatments. Mr. West struggles, but manages, to find affordable care for his son.[4]

### B. Mr. West's Performance on Pretrial Release

Mr. West spent only two days in custody before being released on bond. This limited time in pretrial custody is credited to his parents' immediate reaction and willingness to support their son through such an event. He has been on pretrial release for a *year and a half*, and his performance has been extremely positive. Mr. West began seeking mental health treatment. This is one of the first times in Mr. West's adult life that his mental health has been under control.

After years of working seasonal, temporary jobs, and being riddled by financial insecurity, Mr. West was able to find a full-time job. Mr. West is working about six days a week, forty-five hours a week, at Taco Bell. At the time of hiring, Mr. West's employer knew about his federal drug felony, *including* that he pled guilty. Despite this, not only has Mr. West earned and maintained trust and respect of his employer and coworkers, he has received a promotion to a shift manager.

Last fall, after work, Mr. West went to the emergency room thinking he might have had COVID-19. After testing, emergency room staff discovered that he had an abnormal heartbeat and testing results that required further diagnostics.[5] After months of further testing, it was determined that Mr. West has abnormal heart rhythms that require him to have heart surgery on June 28, 2021.[6]

### III.   THE UNITED STATES SENTENCING GUIDELINES RANGE

Pursuant to 18 U.S.C. § 3553(a)(4)(A), the Guideline's sentencing range must be considered when adjudicating Mr. West's sentence. *See Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (the Guidelines are the "starting point and the initial

---

[4] *See id.* at ¶ 32.
[5] *See*, Exhibit A, Mr. West's Medical Documents (under seal).
[6] *Id.*

benchmark"). However, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007).

### A. Minor Role

In agreement with the government and probation, Mr. West recommends a downward adjustment for minor role. Mr. West was substantially less culpable than the average participant in the smuggling activity, and should qualify for the adjustment. *See* USSG § 3B.12.

### B. Combination of Circumstances

Mr. West requests an additional downward departure based on combination of circumstances due for his positive performance on pretrial release, his family circumstances, and the state of his health. *See* USSG § 5K2.0.

1. <u>Positive Performance on Pretrial Release</u>

Mr. West has been exceptional on pretrial release for the *last 18 months*. Mr. West "has maintained full compliance while on bond."[7] Mr. West has worked to maintain his mental health. Despite not having steady and stable employment for almost a decade prior to his arrest, while on pretrial release, Mr. West has obtained fulltime employment and quickly established himself as a reliable worker.[8] Mr. West has since maintained employment at Taco Bell, and was quickly promoted.[9] As his employer, Dylan Brum, describes, Mr. West as a very hard worker and "highly reliable."[10] Despite working 40-45 hours a week, Mr. West "shows up to work with a smile and leaves with one."[11] Brum describes Mr. West as a having been a member of his work family before he was even employed.[12] Despite being in such an embarrassing and horrible situation, Mr. West has maintained full transparency with Brum, and

---

[7] *See* Dkt. at 27, p. 10, ¶ 10.
[8] *See* Exhibit B, Letter of Support, Dylan Brum.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

Brum promises "there will always be a door open for him here."[13]  Since the time Brum wrote his letter of support, Mr. West was considered and got that promotion.

### 2. Family Circumstances

Mr. West is a loving father, who supports his son in all his hobbies.[14]  "From his son all the way to [his] blended family, the children adore [Mr. West] and he loves [his fiancé's] children like his own."[15]   Given that Mr. West cares for not only his biological son, but his fiancée's children, any separation caused by incarceration will be of extreme consequence to Mr. West's family.  Of important concern is not necessarily Mr. West or his fiancé's ability to handle such a separation, but rather the disparate impact the separation will have on his children during the longevity of their lives.  For example,

- Eighty-two percent of studies on father involvement and child well-being found "significant associations between positive father involvement and offspring well-being.[16]

- Over 100 studies on parent-child relationships found that a loving and nurturing father was *as important* for a child's happiness, well-being, and social and academic success as having a loving and nurturing mother. Some studies even indicated father-love was a *stronger* contributor to some important positive child well-being outcomes.[17]

- Positive father care is associated with more pro-social and positive moral behavior in boys and girls.  Children who feel a closeness and warmth with their father are twice as likely to enter college, seventy-five percent less likely to have

---

[13] *Id.*

[14] *See* Exhibit C, Letter of Support, Mark Gonzales.

[15] *See* Exhibit D, Letter of Support, Arlyn Avalos

[16] Amato, P., Rivera, F., *Paternal Involvement and Children's Behavior Problems*, Journal of Marriage and Family, 61 (1999): 375-384.

[17] Rohner, R., Veneziano, A., The Importance of Father Love: History and Contemporary Evidence, Rvier of General Pychology, 5.4 (2001): 382-405.

- a child in their teen years, eighty percent less likely to be incarcerated, and half as likely to show various signs of depression.[18]
- In a twenty-six yearlong study, researchers found the primary factor in developing empathy in children was father involvement. Fathers spending regular time alone with their children translated into children who became compassionate adults.[19]

Additionally, given Mr. West's preteen son's PID, it seems unlikely that his son will be able to be medically cleared to visit his father in a jail facility given the lasting effects of the COVID-19 pandemic and other potential health outbreaks that are inherent to custodial settings.

3. Mr. West's Health

While Mr. West has been awaiting sentencing, Mr. West learned that he has significant heart health issues.[20]  Overall, Mr. West's health concerns have resulted in a scheduled surgery on June 28, 2021.[21]  The procedure will require an electrophysiological study[22] and an ablation[23] is anticipated.[24]  Mr. West's newly

---

[18] Furstenberg, F., Harris, K., When and Why Fathers Matter: Impacts of Father Involvement on Children of Adolescent Mothers. *Young Unwed Fathers: Changing Roles and Emerging Policies,* R. Lerman and T. Ooms, eds. (Philadelphia: Temple University Press, 1993).

[19] Koestner, R., et al., *The Family Origins of Empathic Concern: A Twenty-Six Year Longitudinal Study*, Journal of Personality and Social Psychology, 58 (1990): 709-717.

[20] Exhibit A.

[21] *Id.*

[22] A procedure where a thin wire electrode is placed in a vein and subsequently the heart.  Once the wire has traveled to the heart, the electrodes measure the heart's electrical signals.  Additionally, electrical signals are sent through the electrodes to stimulate the heart tissue.  *See* Electrophysiological Studies , John Hopkins Medicine, available at: https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electrophysiological-studies (last accessed: June 20, 2021).

[23] Cardiac ablation uses hot and cold energy to create scars in heart tissue to block abnormal electrical signals and restore a normal heartbeat.  Risks include heart valve and blood vessel damage, and it is not a guaranteed fix for heart related problems.  *See* Cardiac ablation, Mayo Clinic, available at: https://www.mayoclinic.org/tests-procedures/cardiac-ablation/about/pac-20384993 (last accessed: June 20, 2021).

[24] Exhibit A, at p. 1.

discovered health concerns during the pendency of this case further warrant an additional consideration as "combination of circumstances" under §5K2.0.

## IV. THE § 3553(A) FACTORS SUPPORT A SENTENCE OF HOME CONFINEMENT

Mr. West's **history and characteristics** are mostly mitigated.  It is notable that someone who is almost 40 years old does not have any criminal history, convictions, or arrests as an adult or from when he was a juvenile.  His childhood was difficult due to his father's open physical abuse, but Mr. West finished school and taught himself various computer skills.  Prior to this offense he had unstable, seasonal employment.  But it is very commendable and speaks volumes of his work ethic that over the last year – ***since he pled guilty*** – Mr. West found full-time, stable employment, and received a promotion.  His employer is appraised of his current criminal conviction, yet remains supportive.

Further, leading up to the offense, Mr. West struggled with anxiety and depression that was overshadowed by his second divorce from the mother of his son.  Nonetheless, over the last 18 months, Mr. West has been addressing his mental health concerns in a productive and beneficial way to give him the tools to avoid any serious setbacks in the future.  Additionally, Mr. West, who used drugs and alcohol up to his arrest, has maintained sobriety.  Nonetheless, despite the struggles that Mr. West has overcome, it is clear in the letters of support from employers and loved ones, he is supported and believed in, and he remains a good man and a good father despite his criminal conviction.

Further, since the offense, Mr. West's heart conditions, resulting in the need for surgery and unknown complications that can later occur, are particularly mitigating given the concerns of the unknown, and the ability for a correctional institute to care for his health needs.

The **nature and circumstances** of this offense are mixed.  Attempting to import narcotics (Mr. West did not know at the time it was methamphetamine, but did

know that it was a controlled substance) into the United States is a serious felony. In mitigation, this was Mr. West's first attempt to import narcotics into the United States. He fully confessed post-arrested. Mr. West also accepted responsibility for his conduct by pleading guilty as soon as he could. Mr. West is also very remorseful for his actions in committing the offense.

The offense is also significantly mitigated by Mr. West's performance on pretrial release. For over a year and a half, Mr. West has addressed a lot of the personal struggles and problems he had that contributed to him committing this offense. He has obtained a stable job, got a promotion, addressed and been working on his sobriety, and he has been treating his mental health. Mr. West devotes all his free time to his son, fiancé, and fiancé's children. This arrest was his wake up call to straighten out his life. He has matured a lot during the last 18 months and he is not the same person he was in December 2019 when he committed this offense.

**Specific deterrence** is not a concern as this experience and the effects Mr. West dreads this will have on his son and stepchildren are the driving forces to ensure that he will not reoffend. Additionally, given his newly discovered heart conditions, and conversations with Counsel about what some of the limitations of health care can be in a custodial setting, Mr. West will ensure that he will not put his health in jeopardy in the future. As Mr. West will address the Court, his remorse weighs greatly on him. As for **general deterrence**, a report by the Sentencing Commission shows what we have long known:[25] more prison time does not result in

---

[25] National Institute of Justice, *Five Things About Deterrence* (Sept. 2014) ("certainty of being caught is a vastly more powerful deterrent than the punishment; "prisons may have opposite effect of deterring crime"); Nagin, D., *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis"); Brennan Center for Justice, *What Caused the Crime Decline?* (Feb. 2015) ("The National Academy of Sciences (NAS) concluded that 'insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects.'"); National Institute of Corrections, *Myths and Facts: Why*

less crime, at least with respect to drug offenders.[26] In a less defense-favorable study, the Sentencing Commission concluded that sentences longer than 120 months did have some deterrent effect.[27] However, for those serving shorter sentences, like what Mr. West's Sentencing Guidelines advise, even that study "did not find any statistically significant criminogenic or deterrent effect."[28]

Given Mr. West's lack of criminal history, combined with the proactive steps he has made to correct his behavior while on pretrial release, there is not a concern for **protecting the public** of any further crimes.

## V.   RECOMMENDATION

In light of the foregoing, Mr. West respectfully requests this Court exercise its judicial discretion and impose an alternative sentence of 18 months home confinement followed by five years of supervised release.  This will permit him to address the unknowns of his heart health and continue to work on bettering himself in a non-custodial environment, yet provide a punishment, as he will be confined to his home but for very limited, health-related circumstances.  A year and a half of home confinement, particularly now, will be a significant sentence, but not put Mr. West's life in further jeopardy given his heart condition.  Further, in the speculative event that Mr. West fails to abide by the terms and conditions of home confinement, the Court would retain the power to punish him for any violation.

---

*Incarceration is Not the Best Way to Keep Communities Safe* (2016) ("[r]esearch suggests that incarceration does little to change a person's behavior"); Clark, Patricia, Office of Justice Programs, National Institute of Justice, *Preventing Future Crime with Cognitive Behavioral Therapy*, 265 Nat'l Instit. of Just. J 22 (2010) ("Cognitive behavioral skill-building is more effective in reducing future criminal behavior than punishment even among persons at high-risk of reoffending.").

[26] United States Sentencing Commission, Length of Incarceration and Recidivism (Apr. 29, 2020), available at: https://www.ussc.gov/research/research-reports/length-incarceration-and-recidivism (last accessed: Feb. 16, 2021).

[27] *Id.*

[28] *Id.*

A prison sentence will certainly not further any of the § 3553(a) factors, and would be counter to them. Indeed, given his newly discovered heart problems, a custodial sentence can severely injure Mr. West further than what is necessary to punish him for his importation offense. Mr. West further requests the following specific conditions:

- 18 months of full home detention (electronic monitoring), only permitting medical treatment;
- No travel outside of the San Diego County without the Court or the probation office's permission;
- 200 hours of community service, to be served within a drug affected community during the time of his supervised release; and
- 5 years supervised release following his home detention.

## VI. CONCLUSION

Given the circumstances in this case, including Mr. West's lack of criminal history, his personal characteristics, his performance on pretrial release, his newly discovered health concerns, and his family circumstances, Mr. West respectfully requests 18 months of home confinement with the specific terms outlined above, as it is sufficient but not greater than necessary to accomplish the purposes of sentencing laws.

Respectfully submitted,

Dated: June 21, 2021

*s/ Leah W. Gonzales*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
CHRISTOPHER WEST
Email: Leah_Gonzales@fd.org